IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff-Respondent,

v.                                  CIV 06-0343 WJ/KBM
                                      CR 02-1056 WJ

FRANK GABALDON,

     Defendant-Movant.

# PROPOSED FINDINGS/DISPOSITION AFTER REMAND

This habeas matter was initially dismissed as time-barred and is now before the Court on the briefing filed after a remand from the Tenth Circuit. *See Docs. 43, 49, 50.* For the reasons below, I recommend that the 2255 petition[1] be dismissed.

---

[1] Although the federal form for initiating a § 2255 action is captioned "motion," as is the common practice both in this Court and the Tenth Circuit, I refer to the document as a "petition." *See, e.g., United States v. Gaines,* 2008 WL 4925837 at * 1 (10th Cir. 11/18/08) ("seeks a certificate of appealability . . . to challenge the district court's denial of his 28 U.S.C. § 2255 petition"); *United States v. Hardridge,* 239 Fed. App'x 412, (10th Cir. 2007) ("his 28 U.S.C. § 2255 petition to vacate, modify, or set aside his sentence"), *cert. denied,* 128 S. Ct. 1263 (2008); *United States v. Jose Garcia-Cardenas,* CIV 08-0382 LH/KBM (*Doc. 7* at 2) ("Defendant raises three claims in his § 2255 petition").

# I.  Introduction

A jury convicted Gabaldon of kidnapping and murder.  He was acquitted of the witness tampering charges.  On direct appeal, the Tenth Circuit rejected his arguments that the evidence was insufficient to support a conviction under the federal kidnapping statute and that a defense accident reconstruction expert was impermissibly excluded from testifying under *Daubert.*  The Supreme Court denied certiorari and rehearing.  *See United States v. Gabaldon,* 389 F.3d 1090 (10th Cir. 2004), *cert. denied,* 544 U.S. 932, *reh'g denied,* 544 U.S. 1045 (2005).

Gabaldon's two § 2255 motions are identical in content except that the amended motion contains a conclusion and proof of service sheet.  *See Docs. 1 & 4.* They are supplemented by an extensive memorandum.  *See Doc. 2.*  Although counsel was permitted to enter a limited appearance and responded to my order to show cause why the case should not be dismissed as time-barred, the professional-looking § 2255 petitions and response after remand were filed *pro se* and, therefore, will be afforded a liberal construction.[2]

---

[2] Again, I will not resolve whether Gabaldon is receiving assistance from a member of the bar or jailhouse attorney, but note the Tenth Circuit's position on ghostwriting.  *Financial Instruments Group, Ltd. v. Leung,* 30 Fed. App'x 915, 917 (10th Cir. 2002) ("the district court expressed concern that an attorney was ghostwriting Leung's pleadings, allowing her to misrepresent her status as a *pro se* defendant in order to obtain more leeway as an unrepresented party. . . .  *See also Haines v. Kerner,* 404 U.S. 519, 520 (1972) (calling for liberal construction of *pro se* pleadings). . . .  While we cannot reach any definitive conclusion, we share the district court's concern.");  *Duran v. Carris,* 238 F.3d 1268, 1271, 1273 (10th Cir. 2001) ("any

Gabaldon raises five separately-numbered claims that primarily focus on the interrelationship between the charge of aiding and abetting and the defense of voluntary intoxication. *See Docs. 1, 2, 4.* However, I must first address the issue of timeliness.

## II.  Timeliness

The Tenth Circuit disagreed with this Court's *sua sponte* finding, issued prior to a United States' response, that there were no grounds for equitable tolling of the applicable statute of limitations. In its brief after remand, the United States raises the issue of timeliness. It relies on the portions of the Tenth Circuit's opinion where it:  did not allow the United States to supplement the appellate record with additional evidence; observed that the "district court should in the first instance have an opportunity to consider this additional evidence;" and concluded that "Mr. Gabaldon's sworn statements and other evidence . . . are not sufficient to establish his ultimate entitlement to equitable tolling' [because] the government has not yet had to opportunity to contest Mr. Gabadon's allegations in the district court."

*United States v. Gabaldon,* 522 F3d. 1121, 1124 n.3, 1127 (10th Cir. 2008); *see also*

---

ghostwriting of an otherwise *pro se* brief must be acknowledged by the signature of the attorney involved."); *Barnett v. LeMaster,* 12 Fed. App'x 774, 779 (10th Cir. 2001) (attorney-assisted *pro se* briefs are not entitled to liberal construction). I also note that Gabaldon's case recently received some scholarly attention. *See* Christopher A. Villanti, Comment, *A Game of Hold'em:  Critiquing United States v. Gabaldon's "All-In" Approach to Federal Kidnapping,* 81 ST. JOHN'S L. REV. 701 (2007).

*Doc. 43* at 3.

To be entitled to equitable tolling an inmate must establish "extraordinary circumstances" and "diligence." *Coppage v. McKune*, 534 F.3d 1279, 1281 (10ᵗʰ Cir. 2008) (citing *Gabaldon*, 522 F.3d at 1224). When this Court made its original decision about tolling, it did so based on a timeline of events that was presented in the counseled brief filed on behalf of Gabaldon. *See Doc. 14* at 1-6. It is true that the Tenth Circuit did make the above observations and remanded for "further proceedings." However, it also answered both prongs of the tolling inquiry in the affirmative based on the facts that it found dispositive.[3] The facts the Tenth Circuit relied upon are not changed by the evidence submitted by the United States after remand. In this posture then, the findings by the Tenth Circuit are the

---

[3] The Tenth Circuit found that "six weeks before the expiration of the limitations period, prison officials confiscated "*all*" of Gabaldon's "legal documents" and refused to return them "despite his numerous requests before his deadline that they do so." 522 F.3d at 1124 (emphasis in original). It held that "complete confiscation of Mr. Gabaldon's legal materials just weeks before his filing deadline would constitute extraordinary circumstances for the purposes of equitable tolling." *Id.* at 1126; *see also, e.g., Coppage v. McKune*, 534 F.3d 1279, 1281-82 (10ᵗʰ Cir. 2008) ("We agree with the district court that Mr. Coppage's circumstances were not 'rare and exceptional.' . . . Compare the facts in *Gabaldon*. Prison officials placed Gabaldon in segregation and confiscated all his legal materials (including a draft § 2255 [petition] and brief) 'just six weeks before the expiration of the limitations period and held them until two weeks after that period expired.' . . . Mr. Coppage was not similarly precluded from filing a timely application.").

The Tenth Circuit also disagreed that placement in segregation for a disciplinary infraction as opposed to protection, a factor I relied upon in finding a lack of diligence, was significant because under federal regulations "an inmate's right of reasonable access to legal materials is not conditioned on the type of segregation to which he is assigned." 522 F.3d at 1125; *see also Doc. 14* at 7-8. It specifically held that "[i]n addition to exhibiting diligence in pursuing his claims, Mr. Gabaldon demonstrated due diligence in attempting to retrieve his seized legal materials before his filing deadline." 522 F.3d at 1126-27.

4

law of the case and dispositive of the equitable tolling issue. *See Arizona v. California,* 460 U.S. 605, 618 (1983) ("[w]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *Rohrbaugh v. Celotex Corp.,* 53 F.3d 1181, 1183 (10th Cir. 1995) ("[W]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal.").  Therefore, I recommend that the United States request to dismiss on timeliness grounds be denied.

Moreover, the issue of whether Gabaldon was the victim or aggressor in a fight that resulted in his placement in segregation has no bearing on the above analysis.  Accordingly, I recommend that the tangential motions about the issue be denied as such.  *See Docs. 51, 52.*

# III.   Analysis Of Merits

All six counts of the superceding indictment against Gabaldon contain 18 U.S.C. § 1152 as a statutory basis because that statute extends federal crimes to "Indian country."[4]  Counts I and II of the superceding indictment charged

---

[4]  18 U.S.C. § 1152 provides, in pertinent part:

Gabaldon with murder and kidnapping in violation of 18 U.S.C. § 1111 and 18

U.S.C. § 1201(a)(2), respectively.[5]  Count II of the original indictment charged

that the kidnapping was also in violation of the federal "aiding and abetting"

statute.[6]  The superceding indictment amended Count I so that it also contained

_____

> Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country."

[5] 18 U.S.C. § 1111 provides, in pertinent part:

> (a) Murder is the unlawful killing of a human being with malice aforethought.  Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

> Any other murder is murder in the second degree.

18 U.S.C. § 1201(a)(2) provides, in pertinent part:

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when . . . (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States . . . shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

[6] 18 U.S.C. § 2 provides, in full:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

the "aiding and abetting" charge for murder.  *See United States v. Gabaldon, et. al,* CR 02-1056 WJ (Docs. 1, 49); *see also id.* (Doc. 91 at 4-6 hereinafter "Jury Instructions").  The remaining four counts charged Gabaldon with causing Nicola Gabaldon and Raldon Begay to conceal evidence by intimidating or threatening them, in violation of 18 U.S.C. § 1512(b)(2)(B).

According to the Government's theory, Gabaldon was the abusive and feared instigator of the crimes.  He not only directly participated in the severe beating of the victim, but also directed his wife Nicola and friend Begay to beat, strangle, and dispose of the victim and other evidence.

Gabaldon's contended that while driving in Gallup with Nicola and Begay, they came upon a sixteen-year old girl and asked her if she wanted to "party" with them.  She accepted the ride, but refused Begay's advances.  Nicola and Begay, who were carrying on an affair, became irritated with the victim and instigated the beating.  Galbadon claimed that shortly after he initially convinced them to take the victim to the hospital, he passed out from drinking too much alcohol.  He further maintained that, unbeknownst to him, some of the alcohol he and the victim had consumed had been laced with the "date-rape" drug "GHB" that Begay

---

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

intended for the victim.

Nicola, Begay and Petitioner all testified at trial.  Their testimony about Gabaldon's intoxication and participation was diametrically opposed.  *See, e.g., Trial Transcript* at 430-46, 571-636, 789-95, 810-36.  The cornerstones of the defense were:  (1) Nicola and Begay were lying – Gabaldon did not participate in anything that could have caused the victim's death; and (2) Gabaldon's mere presence in the vehicle is not sufficient to convict him.  Specifically, Galbaldon argued that it was Nicola and Begay who became angry at the victim over sex, it was Begay who beat the victim, and it was Begay who poured alcohol down the victim's throat while she was unconscious from the beating.  The jury also could not find Gabaldon guilty as an aider and abettor for failing to intervene on the victim's behalf – though it was physically impossible for Gabaldon to get into the back seat area from where he sitting due to his almost 400 pound size, he did try to intervene to stop Begay from beating the victim.  He was the one who told Nicola and Begay to find a hospital, and he thought they were on their way there when Begay gave him what the victim had been drinking.  Thereafter, he was not conscious when Begay and Nicola made the decision not to help the victim.  Instead it was Begay who choked her, burned her fingertips to destroy any DNA evidence, and with Nicola's assistance, took her to a remote location and tossed

8

her down into an arroyo.  *See, e.g., Trial Transcript* at 24-33, 810-36, 1004-1033.

## A.  Intoxication & Aiding/Abetting Issues

*The Claims.*  The bulk of Petitioner's claims concern the interplay between aiding and abetting and voluntary intoxication.  In his first two claims for relief, Gabaldon argues that the voluntary intoxication instruction should have been made applicable to second degree murder and kidnapping because of the Government's reliance on an aiding and abetting theory, and that his attorney was ineffective for failing to request that the instruction be given that way.  *See Doc. 2* at 5-12; *Doc. 4* at 5; *Doc. 49* at 11-17, 21-24.  In claims 4 and 5, he asserts that appellate counsel should have raised the issue that the aiding and abetting jury instruction was erroneous and confusing, and that the evidence was insufficient to convict him of the specific intent required for his conviction on aiding and abetting a kidnapping.  *See Doc. 2* at 20-24; *Doc. 4* at 6; *Doc. 49* at 36-49.

*Unavailing United States Arguments.*  Before turning to the merits, I note that some of the arguments of the United States are unavailing.  For example, the United States asserts that the first claim is defaulted because it was not raised on direct appeal.  This argument is not dispositive, however, because as the United States acknowledges, a claim of ineffective assistance of counsel, like the one made

here, can overcome a waiver. *See Doc. 43* at 14-15. And, it is just as efficient to discuss the merits of the claims together, without separately discussing whether the ineffectiveness claims will overcome the United State's assertion of waiver. *See United States v. Cervini,* 379 F.3d 987, 990 (10th Cir. 2004), *cert. denied,* 544 U.S. 904 (2005); *United States v. Pennington,* 219 Fed. App'x 805, 807 (10th Cir.), *cert. denied,* 128 S. Ct. 281 (2007).

The United States also contends that defense counsel decided "not to pursue a voluntary intoxication defense" because it was a "weak defense" and instead "made the decision to pursue a defense of actual innocence." *Id.* at 19. It maintains that "after arguing that his client did not commit the alleged acts at all," defense counsel would have "completely sabotaged his case by turning around and saying, 'but even if he did to it, he was too drunk to know what he was doing.'" *Id.* at 22. I disagree with this characterization of the defense theory. It is true that counsel did not defend on voluntary intoxication alone, nor did counsel stress the voluntary intoxication instruction to the jurors. But it was clear from opening to closing, and as demonstrated below, that Gabaldon's intoxication was a integral part of the defense theory. Indeed, defense counsel requested an instruction on voluntary intoxication.

The United States alternatively argues that Gabaldon did not introduce

10

sufficient evidence of intoxication at trial to warrant the voluntary intoxication instruction in the first instance. *See id.* at 15-17. However, Gabaldon in fact testified that he was intoxicated to the point of blacking out, and Judge Johnson in fact gave the requested intoxication instruction to the jury without objection from the United States. On habeas review, this Court cannot ignore what actually happened at trial. *See Trial Transcript* at 961-85 (jury instruction conference).

*Plain Error Is Not The Standard Of Review On Federal Habeas.* Also before I turn to the merits, I note that Gabaldon maintains "plain error" is the applicable standard of review. *See Doc. 49* at 31-32, 46. This is a habeas matter under § 2255, however, and plain error is not applicable. *E.g., United States v. Frady,* 456 U.S. 152, 166 (1982) ("the lower court's use of the "plain error" standard to review Frady's § 2255 motion was contrary to long-established law from which we find no reason to depart. We reaffirm the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal.").

*Merits.* Second-degree murder, kidnapping, and voluntary manslaughter are "general intent" crimes – as such, voluntary intoxication *is not* a potential defense.[7]

---

[7] *See United States v. Hernandez-Hernandez,* 519 F.3d 1236, 1238 (10th Cir.) (general discussion of voluntary intoxication and citations therein to decisions that hold it is not a defense to a "general intent" crime), *cert. denied,* 129 S. Ct. 162 (2008); *United States v. Visinaiz,* 428 F.3d 1300, 1310 (10th Cir. 2005)

Witness-tampering, first-degree murder, and "aiding and abetting" are "specific intent" crimes – as such, voluntary intoxication *is* a potential defense.[8]   Gabaldon thus argues that "aiding and abetting" murder and kidnapping is a "specific intent" crime and, in support, he relies heavily on the case of *United States v. Sayetsitty*, 107 F.3d 1405, 1412 (9th Cir. 1997).   The United States does not dispute the proposition.   Indeed, the United States cites the Tenth Circuit's *Jackson* case for the proposition that aiding and abetting is a specific intent crime, which in turn relies on the *Sayetstitty* decision.   *See Doc. 43* at 15-16.[9]

---

(second degree murder under 18 U.S.C. § 1111 is general intent crime), *cert. denied*, 546 U.S. 1123 (2006); *United States v. Williams*, 403 F.3d 1188, 1194 (10th Cir.) (same), *cert. denied*, 546 U.S. 896 (2005); *United States v. Gabaldon*, 389 F.3d 1090, 1094, n.1 (10th Cir. 2004) (kidnapping under 18 U.S.C. § 1201(a)(2) is a general intent crime); *United States v. Jackson*, 213 F.3d 1269, 1292 n.12 (10th Cir.) ("in *United States v. Hatatley*, 130 F.3d 1399 (10th Cir. 1997), we . . . reasoned that by allowing the government to proceed against the defendant only as a principal on the theories of voluntary manslaughter and second degree murder, expert testimony on the defendant's state of voluntary intoxication during the crimes was rendered irrelevant because these are general intent crimes for which voluntary intoxication is not a defense."), *judgment vacated on other grounds*, 531 U.S. 1033 (2000) (vacated in light of *Apprendi*).

[8]   *See United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000) (contrasting that first-degree murder under 18 U.S.C. § 1111 is specific intent crime, while second-degree is general intent crime)*; United States v. Kellington*, 217 F.3d 1084, 1098 (9th Cir. 2000) ("18 U.S.C. § 1512(b)(2)(B). This is a specific intent crime"); *Jackson*, 213 F.3d at 1292 ("the crime of aiding and abetting [under 18 U.S.C. § 2] is a specific intent crime because it requires the defendant to act willfully by participating in the venture and also requires the defendant to have the specific intent to make the venture succeed through his or her acts.  Therefore, voluntary intoxication is a potential defense for an aiding and abetting charge.").

[9]   *See Jackson*, 213 F.3d at 1292 ("Thus, the crime of aiding and abetting is a specific intent crime because it requires the defendant to act willfully by participating in the venture and also requires the defendant to have the specific intent to make the venture succeed through his or her acts.  Therefore, voluntary intoxication is a potential defense for an aiding and abetting charge.  *See United States v. Nacotee*, 159 F.3d 1073, 1076 (7th Cir. 1998)  (holding the crime of aiding and abetting requires "the specific intent to aid in the commission of the crime in doing whatever [the defendant] did to facilitate its commission" and therefore, the defendant's "voluntary intoxication, if sufficient to negate the required

One of Gabaldon's arguments is that because it is "impossible" to tell whether the jurors found him guilty based as a principal/direct participant or as an aider and abettor of the same and, as such, the "verdict must be set aside" under *Griffin v. United States,* 502 U.S. 46, 51-56 (1991) and *Yates v. United States,* 354 U.S. 298, 212 (1967). *See Doc. 2* at 7; *Doc. 49* at 20. On the other hand, he asserts that the record could not be more clear that aiding and abetting was what the United States argued to the jury. Unlike Gabaldon, I do not read the United States' brief as suggesting otherwise. In fact, I agree with him that aiding and abetting was not an "alternative" theory of liability – it was the sole basis for liability.[10] As such, there is no *Griffin* error presented based on the way Gabaldon

---

intent to aid and abet, would provide [the defendant] with a defense."); *Sayetsitty,* 107 F.3d at 1412 (holding because aiding and abetting requires an element of specific intent, the court erred by refusing to give a voluntary intoxication instruction).").

[10]   *See, e.g., Doc. 2* at 7 ("In Petitioner's case, the government's attorney . . . make clear the core of its case on counts 1 and 2 are specific intent crimes by stating 'this is an aiding and abetting case'"); Doc. 49 at 18 ("The jury was not given an either or option as aiding and abetting was intrinsic to the government's case against Gabaldon . . . from the very start, aiding and abetting was the central theme of the government's case against Gabaldon. . . . There is no doubt that Gabaldon was indicted for aiding and abetting murder and aiding and abetting kidnapping and no doubt that the jury was instructed likewise."); *Trial Transcript* at 20 (Government opening statement: "Ladies and Gentlemen, Frank Gabaldon stands accused of murdering and aiding and abetting or helping others murder Deirdre Dale."); *id.* at 970 ("This is an aiding and abetting case [and a proposed instruction] standing alone would misled this jury that we would have to prove that Mr. Gabaldon was the direct cause of everything that happened to her, and that is absolutely not the case under 18 U.S.C., Section 2, with which he is charged."); *id.* at 988-89 (Government closing statement begins with "I'm going to point one thing out to you right form the get-go, and that's Instruction No. 11. . . . you may be thinking . . . Gabaldon and . . . Begay killed this girl . . . did all this, or one of them did it and the other one helped, and how are we supposed to know which is which [regarding the elements of first-degree and second-degree murder]". Well, the answer to that . . . and a very important answer it will be in your deliberations, is in Instruction No. 11 . . . So which one did it? Which one helped? Instruction No. 11 tells you that does not matter as to Counts I and II.") (internal

characterized the issue.  The analysis below, however, also demonstrates that there is no harm even if an error occurred.

The United States' proposed Instruction 13 covered aiding and abetting, the Court's proposed instructions did not modify it, nor did the defense written submission contain an objection to it.  At the jury instructions conference, the only thing defense counsel did request was that the aiding and abetting instruction specify it only applied the murder and kidnapping counts.[11]  The request was granted and the resulting Instruction No. 11 that the jurors heard provided:

> *As to Count I and II,* the guilt of the defendant in this case may be established without proof that the defendant personally did every act constituting the offense alleged.  The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished by him through the direction of another person as his or her agent, *or by acting in concert with,* or under the direction of, another person or persons in a joint effort or enterprise.

> If another person is acting under the direction of the defendant or if the defendant joins another person

---

quotations omitted); *id.* at 1036 (Government rebuttal: "These three people killed this girl.  You have an instruction that's been gone over by both counsel.  I know you'll all read it and study it and use it.  That's Instruction 11 [the aiding and abetting instruction.].").

[11]  *See United States v. Gabaldon, et al.,* CR 02-1056 WJ (Doc. 77 –  United States requested instruction 13); *id.* (Doc. 84 – Defendant objections do not include proposed instruction 13); id. (Doc. 90, Exh. 1 at 24-25 – Court's proposed jury instructions); *Jury Instructions* at 20-21 (Court's instruction 11 to jurors is proposed instruction 13, modified to specifically reflect applicability to murder/kidnapping counts); *Trial Transcript* at 980-81 (defense comment about modification to proposed instruction 13).

and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct.

Before any defendant may be held criminally responsible for the acts of others it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, *and that the defendant voluntarily participated in its commission with the intent to violate the law.*

*Jury Instructions* at 20-21 (emphasis added).  Thus, with respect to murder in any

degree or kidnapping, Gabaldon could not be held liable unless he voluntarily

participated in the acts he accused Nicola and Begay committing, and he himself

had the specific intent to violate the law.  The jurors were also instructed that they

"may consider evidence of intoxication in deciding whether the government has

proved beyond a reasonable doubt that the defendant acted with the intent to

commit first degree murder or the offenses charged in Counts III, IV and V." *Id.* at

25 (Instruction No. 15); *see also United States v. Gabaldon,* CR 02-1056 (Doc. 90,

Exh. 1 at 29 – Court's proposed instruction for voluntary intoxication).[12]

In a habeas proceeding, "[i]f the charge as a whole is ambiguous, the

question is whether there is a reasonable likelihood that the jury has applied the

challenged instruction in a way that violates the Constitution." *Middleton v.*

*McNeil,* 541 U.S. 433, 437 (2004).  The question is not whether "the instruction is

undesirable, erroneous, or even universally condemned," it is whether the

petitioner has show the instruction violated due process.  *Frady,* 456 U.S. at 169

(internal quotations and citations omitted).  In making this determination, the

challenged "instruction . . . may not be judged in artificial isolation, but must be

viewed in the context of the overall charge." *Id.*  (same).

The undisputed theory of liability was aiding and abetting.  But, the jurors

_____

[12]   The defense submitted an instruction on voluntary intoxication that read:  "You may consider
evidence of intoxication in deciding whether the government has proved beyond a reasonable doubt that
the defendant acted with the intent to commit first degree murder, *kidnapping resulting in death,* or the
offenses charged in counts III, IV and V [witness tampering]." *United States v. Gabaldon,* CR -2-1056 WJ
(Doc. 84-9, proposed instruction "H") (emphasis added).  The instruction was based on the Ninth Circuit
pattern instruction 6.8:  "You may consider evidence of [intoxication] [abnormal mental condition] in
deciding whether the government has proved beyond a reasonable doubt that the defendant acted with
the intent to commit [crime charged]." *Model Jury Instructions – Criminal* (available at
http://207.41.19.15/web/sdocuments.nsf/crim); *see also generally* 1A Fed. Jury Prac. & Instr. § 19:05 (6th
ed.).  The defense proposed instruction was technically incorrect because voluntary intoxication is not a
defense to kidnapping and the Court's proposed voluntary intoxication instruction above corrected this
error by dropping any reference to kidnapping.  There was no discussion of the Court's proposed voluntary
intoxication instruction during the jury conference.

were specifically instructed that they could not convict Gabaldon of aiding and

abetting Nicola and Begay in *any* degree of murder or of kidnapping unless they

found that Gabaldon "voluntarily participated" in the acts constituting the crime

and did so "with the intent to violate the law." *Jury Instructions* at 21 (Instruction

No. 11).  The aiding and abetting instruction, with its requirement of specific

intent, supplied the link to the voluntary intoxication defense.  The closing

arguments of the Government and defense counsel did not separate voluntary

intoxication from any of the crimes, I would therefore conclude that the

instructions were not "ambiguous."

 However, I recognize that the instruction itself, as well as the instructions as

a whole, do not specifically link voluntary intoxication to "aiding and abetting."

Alternatively, I will assume, without deciding, that instructions were ambiguous.  I

will also assume, without deciding, that counsel should have submitted and/or

requested additional explicit instructions on the subject.  This does not end the

inquiry, however.

 Ineffective assistance of trial or appellate counsel requires that Gabaldon

show "prejudice" – that is, whether the result of the trial or appeal would have been

different but for counsel's unprofessional errors.[13]  Also, a *Griffin*-error does not

result in automatic habeas relief.  If there is error, the inquiry is whether the error

was "harmless" under the *Brecht* standard – that is, whether it had a "substantial

and injurious effect or influence in determining the jury's verdict."[14]  "Erroneous"

jury instructions are likewise subject to the *Brecht* harmless error standard.  *E.g.,*

*California v. Roy,* 519 U.S. 2, 5 (1996) ("intent" element for aiding and abetting

instruction not given). The common element to all of these claims is the notion of

"prejudice" or "harm" vis-a-vis the jurors' verdict.  All of Gabaldon's claims in this

regard fail.

   The jury found Gabaldon guilty of the general intent crimes – second degree

---

[13]  *See Strickland v. Washington,* 466 U.S. 668, 694 (1984)(a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."); *see also Roe v. Flores-Ortega,* 528 U.S. 470, 481 (2000) ("In most cases, a defendant's claim of ineffective assistance of counsel involves counsel's performance during the course of a legal proceeding, either at trial or on appeal. . . .  In such circumstances, whether we require the defendant to show actual prejudice – 'a reasonable probability that,' but for counsel's unprofessional errors, the result of the proceeding would have been different'").

[14]  *See Hedgpeth v. Pulido,* ___ S. Ct. ___, 2008 WL 5055738 at * 2 (2008) ("Both *Stromberg* and *Yates* were decided before we concluded in *Chapman v. California* . . . that constitutional errors can be harmless. . . .  In a series of post-*Chapman* cases . . . we concluded that various forms of instructional error are not structural but instead trial errors subject to harmless-error review. . . .  Although these cases did not arise in the context of a jury instructed on multiple theories of guilt, one of which is improper, nothing in them suggests that a different harmless-error analysis [*Brecht*] should govern in that particular context."); *Fry v. Plier,* ___ U.S. ___, 127 S. Ct. 2321, 2325 (2007) ("Under [*Brecht*] standard, an error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict.") (internal quotations omitted); *United States v. Dago,* 441 F.3d 1238, 1244-46(10th Cir. 2006) (*Brecht* standard applies in § 2255 proceedings challenging omission in jury instructions).

murder and kidnapping, Counts I and II – but found him not guilty of the specific

intent crimes – first-degree murder and concealment, Counts III, IV, V, and VI.

The key premise to Gabaldon's claims is that the jurors must have believed his

version of the events because they acquitted him of all of the counts where they

had been told they could consider intoxication.  The logical extension of this

argument is that if they had been instructed intoxication applies to aiding and

abetting, they would have acquitted him of murder and kidnapping, too.  *See Doc. 2*

at 8 ("this court should strongly consider the fact that the Petitioner was acquitted

on all the charges where the intoxication instruction was given to the jury").

Having read the entire transcript of the proceedings in great detail, I cannot make

that same leap.

I think it is plain from the evidence, arguments at trial, and verdicts (or at

least equally plausible) that the jurors did not believe Gabaldon was an innocent

bystander who slept through most of the victim's ordeal.  Nor did they believe any

of the witnesses' attempts to minimize their participation in the crimes.  As *defense*

counsel argued in closing:

> So what degree of murder is it?  I suggest to you
> that, if Frank Gabaldon told R.C. Begay to strangle her
> and kill her because she wouldn't die, it's first-degree
> murder, straight up.  If Frank Gabaldon intimidated all of
> these people into burning fingers, into throwing the body

> over, intimidated those people into doing that . . . he's
> guilty of [the concealment counts] as well.  If he's the one
> who forced them to go down and get the carpet changed,
> he's guilty of that, and no two ways about it.

*Trial Transcript* at 1026.  The jurors acquitted Gabaldon of the concealment

counts, not because they doubted he participated, but because they did not believe

he intimidated Nicola and Begay to take the actions they did.

The jurors' second-degree murder verdict also does not convey that they

believed, as defense counsel argued, that Gabaldon "didn't have anything to do

with beating this girl to start with" or was "passed out because of the drugs [GHB

and alcohol]."  *Id.* at 1026.  The evidence showed that an invitation was extended

to the young victim for the purpose of her joining their partying.  She accepted and

the drinking ensued.  The situation did not turn deadly until hours after Gabaldon,

Begay, and the victim had been drinking to excess, and the victim declined Begay's

invitation for sex.  The utterly unjustified response to that rejection was Gabaldon's

suggestion that the victim be hit, which Begay began doing.  Gabaldon then

jumped in on the beating, and it escalated to the tragedy that occurred.  The jurors'

not guilty verdict on first degree murder and voluntary manslaughter reflects that

none of the three murdered the victim as the "result of planning or deliberation,"

but that they did act "with callous and wanton disregard for human life . . . reckless

and wanton [behavior that is] a gross deviation from a reasonable standard of care." *United States v. Gabaldon,* CR 02-1056 WJ (Doc. 91 – jury instructions on options for Count 1).   It is this absence of premeditation and presence of malice aforethought that takes the case out of first-degree murder and voluntary manslaughter and puts into the second-degree murder option.

As such

> since it is logical to assume that the jurors would have responded to an [additional] instruction on [voluntary intoxication and second degree murder] consistently with their determination of the issues that were comprehensively explained, it is equally logical to conclude that such an instruction would not have affected their verdict.  Accordingly, we reject the suggestion that the omission of more complete instructions . . . so infected the entire trial that the resulting conviction violated due process.  Even if we were to make the unlikely assumption that the jury might have reached a different verdict pursuant to an additional instruction, that possibility is too speculative to justify the conclusion that constitutional error was committed.

*Henderson v. Kibbe,* 431 U.S. 145, 156-157 (1977) (internal quotations omitted).

## B.  Ineffective Assistance Of Counsel Re:  Trial Witnesses

All of Gabaldon's other ineffective assistance of counsel claims fail because there is no showing that counsel's performance was deficient and/or that any prejudice resulted.  *E.g., Strickland,* 466 U.S. at 694.  For the reasons above that

illustrate why there is no harm due to any error in the jury instructions as well as

the additional reasons below, Gabaldon has made no showing that would have

changed the result or that would undermine this court's confidence in the jurors'

decision.

   *Gabaldon Was Going To Testify From The Outset.*  Petitioner asserts that

although his trial attorney listed seventeen defense witnesses on the defense

witness list, he "procrastinated" and waited until right before trial to investigate,

prepare, and/or approach them about testifying.  *See Doc. 2* at 12-13; *Doc. 49* at 34-

35.  Gabaldon claims that as a result,

> *It wasn't until June 12, 2003* [the third day of trial],
> *after the Government had rested its case* against the
> defendant, that Mr. Twohig informed Petitioner that
> thirteen of the witnesses had left, canceled or couldn't
> make it to testify.  *Mr. Twohig demanded that the
> Petitioner take the stand, with no preparation or
> advanced warning.*"

*Doc. 2* at 13 (emphasis added).  The bold portion of the assertion is utterly

contradicted by the record.

   From the outset of trial, it was plain that the defense anticipated calling

Gabaldon to testify.[15]  Indeed, the defense opening statement told the jurors that

_____

[15]  *See United States v. Gabaldon, et al.,* CR 02-1056 WJ (Doc. 76 at 4; Doc. 80 at 4 – defense
proposed voir dire contained these questions:  "24. How would you feel if Mr. Gabaldon did not take the
stand in his defense?  A. Would you feel he was trying to hide something?  25. Have you ever been in a

he would testify – "Frank Gabaldon is going to testify as a witness in this case.

You're going to get a chance to evaluate him and the two of them [Nicola and

Begay] and, really, you're going to see that it does depend on which one you believe

and who is telling the truth." *Trial Transcript* at 37-38.  Moreover, the defense

emphasized that fact to its advantage in closing argument, contrasting Gabaldon's

empathetic and warm demeanor to the coldness of Nicola and Begay:

> What kind of person is Frank Gabaldon? . . .  not a
> strong, powerful, dangerous person.  This is a great big
> teddy bear . . . who doesn't have the evil and the malice
> and the self-absorption of . . . Nicola and R.C. Begay. . . .
> He's the only one who came in here and expressed any
> real remorse for what happened . . . even though he
> didn't kill her, he . . . spoke to you from the heart today
> . . .  He didn't have to take the witness stand.  He had a
> right not to.  He could have remained silent, and we
> could have stood up her and talked about these witnesses
> against him just as I am now, but he took the risk and he
> put himself at your mercy and he explained himself to
> you.

*Id.* at 1012-1013.

---

situation where you chose not to say anything even though you were given the opportunity to do so?
Please describe, and tell your reasons for remaining silent.  26. Can you imagine reasons someone on trial
would choose not to testify? What?  Example: Too drunk to recollect details accurately?  27. Would you
be probably be more skeptical of his innocence if he didn't take the stand?"); *Voir Dire Transcript* at 32-34
(Judge Johnson's explanation of burden of proof and right of defendant regarding testifying and, save one,
no prospective juror indicated that he or she disagreed with the judge's statements); *id.* at 116-18 (defense
counsel follow-up questions with particular jurors re: presumption of innocence).

*McKinney, Karch, and Jenkins – "Actual Innocence" regarding Cause of Death.* Petitioner claims the testimony of three potential defense witnesses who did not testify would have demonstrated his "actual innocence" concerning the victim's cause of death. The Government called Dr. Ross Zumwalt, a physician who at the time was the Chief Medical Investigator for New Mexico. *See Trial Transcript* at 303. On direct examination, Dr. Zumwalt testified that the "cause of death was . . . blunt force injury to the head," *id.* at 311, and clarified on cross-examination that it was his opinion "that the most severe injury that precipitated the lethal chain of events was the blunt head injuries, with the alcohol intoxication and perhaps the cervical compression, the ligature around the neck, may have contributed," *id.* at 357.

Part of the defense theory was the suggestion that the cause of death was due to the victim ingesting GHB and copious amounts of alcohol, either administered by Begay or ingested herself, rather than the injuries she suffered from the beating and strangulation.

> But the combination of alcohol and GHB is sufficient to cause death, and that alone could have been the reason why she died. And while Dr. Zumwalt will testify here that the GHB may have been formed after she died, the GHB also may have been in her system before she died, as he will acknowledge. And while it's his view, as you've heard from the prosecution, that the alcohol could have

24

> killed her but didn't get there before the beating did,
> that's quite an open question as to the cause of her death.
> The GHB given to her by R.C. Begay, I submit, is a more
> probable cause than the beating because of the extent of
> and limited extent of the actual injuries.

*Trial Transcript* at 36-37; *see also, e.g. Voir Dire Transcript* at 113; *Doc. 4* at 16, 18.

Gabaldon asserts that his attorney should have called "Dr. McKinney," a "Toxicologist for the New Mexico Poison Center," *Doc. 2* at 15-16, as well as "Dr. Karch and Damion Jenkins," *id.* at 14. He argues these witnesses could have testified that the combination of alcohol and GHB is incapacitating, these substances can cause bleeding to the brain, and the victim's body had high levels of both substances.[16] He maintains their testimony would have contradicted Dr. Zumalt's opinion on cause of death. *See generally id.* at 15-18.

However, defense counsel elicited those very facts and inferences from Dr. Zumwalt during cross-examination. When asked which "blunt force" was fatal, Dr. Zumwalt admitted that it was probably a combination of blows to head and having been dropped down into an arroyo. *Trial Transcript* at 351-53. While he did not believe that bleeding inside the brain could have been the sole "mechanism of death," he did think that those mechanisms included physiologic disruption of

---

[16] "Damion Jenkins" and "Steven Karch" were on the defense witness list. "Dr. McKinney" was not. *See United States v. Gabaldon*, CR 02-1056 WJ (Doc. 75).

neural pathways of brain functioning, problems with heart rate, lack of oxygen to

the brain either from impeded blood flow or due to alcohol intoxication. *Id.* at 354-

57. He admitted that the alcohol intoxication of the victim's stomach contents

was 8% and that "we know the blood [level] had to be very high at the time of

death." *Id.* at 362; *see also id.* at 357-62. He admitted that GHB is used by sexual

predators, that GHB and alcohol have an additive effect, and that medical

literature has reported the combination of the two as causing death. *Id.* at 362-67.

He also admitted there was no way to fix the exact time of death but that they

could tell the victim was rapidly drinking about hour before death. *Id.* at 373.

It is not ineffective assistance of counsel to call witnesses to present

cumulative testimony:

> counsel's failure to call witnesses whose testimony would
> be corroborative or cumulative of evidence already
> presented at trial is not deemed constitutionally deficient.
> *See Humphreys v. Gibson,* 261 F.3d 1016, 1021 (10th Cir.
> 2001) (cumulative evidence would not have led jury to
> reach a different result in sentencing phase of capital case
> and thus cannot provide basis for habeas relief); *Medina
> v. Barnes,* 71 F.3d 363, 367 (10th Cir. 1995) (additional
> evidence was "at most cumulative, and of limited
> probative value" and, as such, could not provide basis for
> habeas relief); *United States v. Schaflander,* 743 F.2d 714,
> 719 (9th Cir. 1984) (trial counsel's failure to call witnesses
> to provide cumulative exculpatory evidence did not
> prejudice defendant) [, *cert. denied,* 470 U.S. 1058 (1985).

*Snow v. Sirmons,* 474 F.3d 693, 729 (10th Cir. 2007). Moreover, the jury did hear this evidence and argument from the defense and rejected it.

*McKinney, Karch, and Jenkins – Involuntary Manslaughter Instruction.* Gabaldon also maintains these witnesses' testimony would have supported his own testimony that he was intoxicated to the point of blacking out after Begay quit beating the victim and during the disposal of her body. Gabaldon alternatively argues that their testimony would have warranted an instruction on "involuntary" manslaughter. *See Doc. 2* at 16, 18.

However, "[i]nvoluntary manslaughter, as defined in 18 U.S.C. § 1112, is a general intent crime. Voluntary intoxication is no defense to such a crime." *United States v. F.D.L.,* 836 F.2d 1113, 1117 (8th Cir. 1988) (and cases cited therein); *see also United States v. Bald Eagle,* 849 F.2d 361, 362 (8th Cir. 1988) ("involuntary manslaughter is a general rather than a specific intent crime and voluntary intoxication is not a defense to general intent crimes.") (internal quotations omitted); *c.f., United States v. Brown,* 287 F.3d 965, 974-75 (10th Cir. 2002) (second degree murder is a general intent crime and distinction between it and involuntary manslaughter is degree of reckless/wanton behavior).

*Witnesses Who Allegedly Would Have Contradicted Particular Facts.* Gabaldon claims counsel should have called Ronnie Begay, the person whom the

victim telephoned that night, asserting that

> "Mr. Begay's testimony would have negated the specific
> intent element injected by the aiding and abetting charge
> due to the fact that he had a conversation with Ms. Dale
> a few minutes prior to her death.  Begay's testimony
> would have damaged the Government case by
> corroborating Petitioner's testimony and drawn a
> different picture of the events in the juror's minds."

*Id.* at 17.  Because this telephone call was made prior to when things went awry and the beating began, this testimony would have had no bearing on the outcome.

Gabaldon also maintains that counsel should have called Mr. Cooka to testify that the vehicle's engine blew up, which is why it ended up in the junk yard, and to contradict Nicola's testimony that Gabaldon was abusive.  *Doc. 2* at 17.  He claims that counsel should have called Begay's mother, who "would have given eye witness testimony that . . . Begay threatened and stabbed Petitioner . . .  tell Petitioner to 'keep his mouth shut or else,'" testimony that would have "directly contradicted" Begay's "and shown the jury he was a leader that in fact threatened to kill Petitioner."  *Id.* at 17-18.

This testimony was not directly relevant to the conduct that constituted the crimes charged.  Also, though Gabaldon's claim suggests that these witnesses would have bolstered his credibility and undermined Nicola's and Begay's testimony, this case does not present a situation where only two of the three witnesses to the crime

testified – all of them did.  *See United States v. Holder,* 410 F.3d 651, 655-56 (10th

Cir. 2005).  Even if the testimony had been heard by the jury, it would have done

little to bolster Gabaldon's credibility or undermine that of Nicola or Begay.  The

jury's verdict reflects that they did not find *any* of the participants were wholly

credible.

     *Conclusory Allegations.* Gabaldon claims, in full, that counsel failed to call

four witnesses who "would have produced relevant testimony that impeached the

testimony of Government witness Nicola Gabaldon." *Doc. 2* at 19.  These

"speculative assertions . . . are clearly insufficient to carry his burden of proving

prejudice." *Boyle v. McKune,* 544 F.3d 1132, 1140 (10th Cir. 2008).

## C.  Evidentiary Hearing

     Gabaldon originally requested an evidentiary hearing.  *Compare Doc. 2* at 24

(requesting evidentiary hearing), *with Doc. 49* at 45-46 (requesting decision in his

favor and "certificate of appealability").  Because the issues can be decided on the

basis of the record before me, however, one is not necessary.  *E.g., United States v.*

*Weidner,* 206 Fed. App'x 826, 828 (10th Cir. 2006) ("The district court need not

conduct an evidentiary hearing, however, if 'the [§ 2255] motion and the files and

records of the case conclusively show that the prisoner is entitled to no relief.'"); 28

U.S.C. § 2255(b) ("Unless the motion and the files and records of the case
conclusively show that the prisoner is entitled to no relief, the court shall . . . grant
a prompt hearing").  Put another way, none of Gabaldon's claims and assertions
would entitle him to relief.  *E.g., United States v. Duran-Salazar*, 2009 WL 74476 at
* 1 (10th Cir. 2009) ("The issue of whether Duran-Salazar is entitled to a hearing
involves a 'two-step inquiry: (1) whether the defendant is entitled to relief if his
allegations are proved; and (2) whether the district court abused its discretion by
refusing to grant an evidentiary hearing.'  *United States v. Whalen*, 976 F.2d 1346,
1348 (10th Cir. 1992).").

Wherefore,

IT IS HEREBY RECOMMENDED that the § 2255 petition *(see Docs. 1, 4)*
be denied and this action dismissed.

IT IS FURTHER RECOMMENDED that the tangential motions
*(Docs. 51, 52)* be denied as moot.

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10
DAYS OF SERVICE of a copy of these Proposed Findings and Recommended
Disposition they may file written objections with the Clerk of the District Court
pursuant to 28 U.S.C. § 636(b)(1).  A party must file any objections with the

Clerk of the District Court within the ten-day period  if that party wants to

have appellate review of the proposed findings and recommended disposition.

If no objections are filed, no appellate review will be allowed.


UNITED STATES MAGISTRATE JUDGE